**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**
_____

PREMIER MEDICAL ENTERPRISE
SOLUTIONS INC.,

        **Plaintiff,**

v.                                                              **No. CIV  09-0165 BB/RHS**

NEW MEXICO SOFTWARE INC. and
RICHARD GOVATSKI,

       **Defendants.**

## MEMORANDUM OPINION AND ORDER

THIS MATTER comes before the Court for consideration of motions for summary judgment filed by the parties (Docs. 53, 55, 59). The Court has considered the submissions of the parties and the applicable law, and issues the following decision.

### FACTS

This case arises out of a commercial dispute and raises issues of both tort law and breach of contract. The two companies involved, Premier Medical Enterprise Solutions Inc. ("Premier") and New Mexico Software Inc. ("Software") were involved in a business relationship that soured. Premier's business consisted of providing "reading" services for x-rays, ultrasounds, and other radiological images. Premier's customer, for example a hospital, would create the image by taking an x-ray or other type of medical scan, and upload that image to the Internet. Premier would supply a radiologist who would read the scan, prepare a report, and submit the report over the Internet to the customer. Premier charged a certain amount for each scan read, paid its radiologists, and (hopefully) made a profit from the difference. Software's part in these transactions was as the Internet "host" of the images and reports. Software supplied the computer program used to upload and transmit the images and reports back and forth over the

Internet.  Software charged a small amount for each transaction in accordance with the contract it had entered into with Premier.

At some point Software decided that instead of simply providing host services, it would like to expand into the reading business itself.  Software created a subsidiary of sorts, named TeleRad, to provide such services.  Under circumstances that are disputed by the parties, one of Premier's biggest customers ended its contract with Premier and began using TeleRad as its radiological-services provider.  In addition, disputes arose between Premier and Software over the amounts Software was charging, and over Premier's failure to pay Software in a timely manner.  Ultimately, Premier filed this lawsuit against Software and Software's head, Mr. Govatski.  Premier raised claims of breach of contract, breach of the covenant of good faith and fair dealing, breach of fiduciary duty, conversion, and tortious interference with contract.  Software counterclaimed for breach of contract.  Both parties have now filed competing motions for summary judgment.

### STANDARD OF REVIEW

Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Medina v. Income Support Div.*,  413 F.3d 1131, 1133 (10th Cir. 2005) (quoting Fed. R. Civ. P. 56(c)).  In response, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial."  *Matsushita Elec. Indus. Co. v. Zenith*, 475 U.S. 574, 587-88 (1986).  To avoid summary judgment, the nonmoving party may not rest upon the mere allegations in the pleadings but must show, at a minimum, an inference of the existence of each essential element of the case.  *Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1016-17 (10th Cir. 2001) (citing *Hulsey v. K-Mart, Inc.*, 43 F.3d 555, 557 (10th Cir. 1994)). When viewing the

evidence, the Court must draw reasonable inferences in favor of the non-moving party.

*Matsushita*, 475 U.S. at 587.  The Court will address the parties' motions with these principles in mind.

**DISCUSSION**

**Breach of Contract Claims**

**(1) Solicitation Clause of Contract:**  The contract entered into by Premier and Software contained a clause prohibiting Software from soliciting Premier's customers; such a clause is described in contracts cases as a "solicitation" or "non-solicitation" clause.  Premier argues that Software breached this clause when it obtained Schryver as a customer for its TeleRad arm.  This type of clause must be distinguished from a non-compete clause, which would forbid a party to a contract from engaging in the same type of business as the other party; the Premier/Software agreement did not contain such a non-compete clause.  In other words, the contract did not prevent Software from forming TeleRad, entering into the business of reading radiological scans over the Internet, and thus competing with Premier for the same business.  The contract does prohibit Software from engaging in solicitation of Premier's customers to attempt to obtain their business at the expense of Premier.  A fairly extensive body of law has been developed setting out the parameters of solicitation clauses and the types of activities that are precluded by such clauses.  The parties, however, vigorously dispute the details of the applicable law as well as the types of conduct that are forbidden under that law.

A brief summary of the facts giving rise to this claim is useful. Software created TeleRad in May of 2008.  [Doc. 59, Exh. 2, p. 146]  TeleRad obtained customers by advertising on the Internet, attending trade shows, visiting hospitals, and making cold-call sales pitches.  [*Id.* pp. 147, 150-51]  One trade show or convention, called the NAPXP convention, was held in late

3

2008.[1]  TeleRad had a booth at this convention, and Todd Hubbard of Schryver Medical noticed

the booth.  He was familiar with the two TeleRad representatives there, Mary Hansen and Bruce

Stabile, because he had come to know them while Schryver was a customer of Premier but was

using Software's services as the Internet connection between Premier and Schryver.  [*See

generally* Doc. 54, Exhs. C and D]  It is undisputed that Mr. Hubbard approached TeleRad's

personnel first to ask about the services TeleRad could provide; what happened after that is hotly

disputed.  It is clear, however, that following the initial approach by Mr. Hubbard, Schryver and

TeleRad exchanged a number of e-mails and telephone calls discussing the extent and quality of

the services TeleRad could provide to Schryver as well as the prices that would be charged for

those services.  [Doc. 91, Exhs. B, C, D, E, F]  Schryver subsequently terminated its contract

with Premier, providing the requisite 60-day notice of termination, and entered into a contract

with TeleRad.

Software's position is that since Schryver, through Mr. Hubbard, first approached

TeleRad, no solicitation occurred as a matter of law.  According to Software, it does not matter

what type of negotiations took place after the initial contact; as long as TeleRad did not make

that first contact with Schryver, anything that occurred after that is irrelevant as far as the

solicitation clause is concerned.  Premier, on the other hand, argues that it does not matter

whether Schryver first approached TeleRad.  Premier contends the solicitation clause was

violated in a number of ways -- first, with the trade-show presentation itself; then with the

subsequent e-mails welcoming Schryver's business, negotiating prices, and in general making

sales pitches to Schryver.  Premier's contention is that the solicitation clause prohibits Software,

---

[1]There is some uncertainty about the exact dates of the convention.  Mary Hansen, a
former executive of Software and TeleRad, states that it took place on October 29-31, 2008.
[Doc. 91, Exh. F]  Todd Hubbard, who worked for Schryver Medical and attended the
convention, believes it occurred in early December 2008.  [Doc. 54, Exh. D]

4

through TeleRad, from attempting in any way to convince one of Premier's customers to contract

with TeleRad, even if TeleRad was simply responding to a proposition made by one of those

customers.  As discussed below, neither party's position accurately reflects the law concerning

solicitation clauses.

The solicitation clause at issue in this case was drafted by Premier, and prohibits Software

from "directly or indirectly" soliciting Premier's customers during the existence of the contract

between Premier and Software.  [Doc. 59, Exh. 1, par. XI]  This is a common form of non-

solicitation clause; similar clauses have been addressed by a number of courts.  All of these

courts have narrowly construed the clauses, and consider the question of who first approached

whom to be highly significant.  *See, e.g., Hunter Group, Inc. v. Smith*, 9 Fed.Appx. 215 (4th Cir.

2001, unpublished); *Slicex, Inc. v. Aeroflex Colorado Springs, Inc.*, 2006 WL 2088282 (D. Utah

2006, unpublished); *J.K.R., Inc. v. Triple Check Tax Serv., Inc.*, 736 So.2d 43, 43-44 (Fla. App.

1999); *Akron Pest Control v. Radar Exterminating Co., Inc.*, 455 S.E.2d 601, 602-03 (Ga. App.

1995); *Alpha Tax Servs., Inc. v. Stuart*, 761 P.2d 1073, 1075-76 (Ariz. App. 1988).  A party

restricted by a non-solicitation clause may advertise generally in an attempt to obtain clients, as

long as the party does not individually contact customers of the beneficiary of the clause.  *See*

*Alpha Tax, supra* (newspaper advertisements directed at public in general did not violate non-

solicitation clause, but mailings addressed personally to plaintiff's customers did constitute

solicitations).  In addition, a non-solicitation clause does not prevent a party from accepting, and

responding to, business proposals made by the clause beneficiary's clients, as long as the party

did not instigate the contact that led to the proposal.  *See Resource Assocs. Grant Writing and*

*Evaluation Servs., LLC v. Maberry*, 2009 WL 1232133, n.3 (D. N.M. 2009, unpublished)

(defendant was permitted to accept business from plaintiff's customers in a reactive fashion);

*Akron Pest Control, supra*; *Alpha Tax, supra*.

5

On the other hand, the mere fact that a non-solicitation-clause beneficiary's clients have initiated the contacts with a party does not immunize the party from any possible breach-of-contract claim, as Software seems to contend.  Negotiations that occur after this initial contact can violate a non-solicitation clause, under certain circumstances.  *See Resource Assocs., supra* ("The Court can imagine solicitation and enticement occurring even when providers have approached Maberry first"); *Scarbrough v. Liberty Nat'l Life Ins. Co.*, 872 So.2d 283, 285 (Fla. App. 2004) ("[A] person may, in appropriate circumstances, solicit another's business regardless of who initiates the meeting").  Such circumstances may include situations in which a party favorably compares its own prices and services to the clause beneficiary's prices and services, rather than neutrally providing information concerning only its own prices and services.  *See Scarbrough*; *see also Resource Assocs. Grant Writing and Evaluation Servs., LLC v. Maberry*, 2009 WL 1232181 (D. N.M. 2009, unpublished)[2]  (even where a provider makes the first move, defendant might violate the non-solicitation clause if she attempts to sell the provider on the benefits of working with her rather than with plaintiff).  They may also include situations in which a party excessively involves itself in the customer's decision-making process, rather than limiting its activities to the normal negotiation process.  *See, e.g.,  FCE Benefit Adm'rs, Inc. v. George Washington Univ.*, 209 F.Supp.2d 232, 239 (D. D.C. 2002) (insurance agent violated non-solicitation clause even though she was initially contacted by customer; agent assumed active role in decision-making process by soliciting alternative price quotes, meeting repeatedly with customer's benefits committee, and preparing numerous spreadsheets including comparisons of customer's current plan to alternative plan, as well as customer's current costs).  In sum, even when a customer initiates contact with a party to a non-solicitation clause, the party

---

[2]The reader should note that this *Resource Associates* opinion is a follow-up to the one cited earlier, and is not the same opinion.

can step over the line between acceptably responding to business proposals and unacceptably touting the merits of its own services over those provided by the clause's beneficiary.

Applying the above standard, it is clear that some of the activities engaged in by Software did not violate the non-solicitation clause. For example, Premier argues that Software impermissibly solicited business simply by having a booth at the NAPXP convention. This is incorrect; as noted above a party may engage in advertisements directed generally at potential customers, and is not required to turn away business resulting from such advertisements simply because the business involves customers of the clause beneficiary. Premier also complains that Software, through TeleRad, offered Schryver pricing terms that were not offered to other TeleRad customers. However, a non-solicitation clause should not prohibit a party to the clause from cutting its prices in an attempt to win business, as long as the party is not basing its prices solely on the beneficiary's prices and undercutting those prices.

At this point, the Court cannot grant summary judgment to either party with respect to the non-solicitation-clause issue. The facts surrounding the initial contact that occurred at the NAPXP convention are murky; although Mr. Hubbard states that he spoke to Mary Hansen at the convention, and approached her rather than being approached by her, he does not provide the substance of the conversation. [Doc. 54, Exh. D] Similarly, Ms. Hansen is vague about the contents of the conversation, saying only that she was "intentionally noncommittal" when she spoke to Mr. Hubbard. [Doc. 91, Exh. F] The events following that conversation are also unclear and disputed; although Mr. Hubbard wrote an e-mail to Ms. Hansen requesting a proposal from TeleRad, there is evidence this was done in response to Ms. Hansen's own request for such an e-mail. [Doc. 59, Exh. 4; Doc. 91, Exh. F] In sum, there are too many facts in dispute, or simply lacking, to allow the Court to determine at this time whether Software did or

did not step over the non-solicitation line in its negotiations with Schryver.  Summary judgment is therefore not appropriate for either party.

The Court notes Software's argument that no causation or damages have been established, because Schryver planned to replace Premier with another provider no matter what. Again, however, the facts are  in dispute as to whether this would have happened, and when, without Software's involvement.  For example, the Court has pointed out evidence that the NAPXP convention was in late October, yet Mr. Hubbard did not e-mail Ms. Hansen until December, and then only at Ms. Hansen's request (at least under one version of the facts).  This evidence, if believed by the fact-finder, would allow a determination that Schryver would not have switched providers, or at least would not have done so as quickly as it did, if Software had not become involved.  As such, it is sufficient evidence of causation and consequent damages to survive the motion for summary judgment.

**(2) Overcharging By Software:**  Premier contends Software breached the agreement between the parties by assessing certain overcharges.  The main point of contention, involving the most money, concerns the question of whether Software was allowed to assess a charge for each report transmitted through its site, or only for each "case."  Most of the medical-image readings (termed "cases" by the parties) transmitted by Software generated only one report, and Software  charged a fee for each report transmitted.  A small minority of the cases, however, generated more than one report.  This could occur, for example, if the physician reading the image submitted an addendum to the first report, or a new report was submitted to fix a typographical error found in a previous report.  [Doc. 59, Exh. 9, pp. 42-45]  Software charged the same report fee for these follow-up reports as for the original reports, despite Premier's position that only one fee should be charged for each case, no matter how many follow-up reports were generated by the case.  The total amount of money at issue in this dispute, at the time the

parties filed their competing motions for summary judgment, was approximately $11,200.  [Doc. 56, Exh. C]

The Court finds there are genuine issues of material fact concerning this issue, precluding the grant of summary judgment to either party.  As Software points out, the agreement between the parties, in discussing payment for Software's services, speaks in terms of reports rather than cases.  [Doc. 1, Exh. 1, par. V]  However, there is no mention in the agreement of supplementary or corrective reports such as those that merely correct typographical errors.  This silence could mean such "extra" reports were intended to be treated the same as original reports, or it could mean the parties did not consider the possibility that more than one report could be generated by a case.  Furthermore, there is testimony from both sides of the dispute that would support the one-fee-per-case argument.  Mr. Govatski, representing Software, and Mr. Potter, representing Premier, both testified in their depositions that the contract obligated Premier to pay a one-time fee for each case, although Software billed for each report.  [Doc. 59, Exh. 2, pp. 31-32; Exh. 9, pp. 41-45]  Although Software argues that evidence extrinsic to the agreement should not be considered because the agreement contains an integration clause, that position is contrary to New Mexico law -- extrinsic evidence may always be considered to determine whether a contract is ambiguous, whether it expresses the true agreement of the parties, and to help resolve any ambiguities that might exist.  *See  Mark V, Inc. v. Mellekas*, 845 P.2d 1232, 1235 (N.M. 1993); *Twin Forks Ranch, Inc. v. Brooks*, 907 P.2d 1013, 1016 (N.M. App. 1995).

The parties also dispute certain other alleged overcharges, such as fax fees and a few cases that allegedly "disappeared" from Software's system.  Software contends any overcharges have been refunded, and no "disappeared" cases exist.  The Court will not attempt to resolve this dispute, since summary judgment will be denied on the overcharging issue in any event.  Instead, the Court will address these minor matters (totaling something less than $1,000) at the upcoming

trial, if they indeed remain in dispute.  For the foregoing reasons, summary judgment will not be granted to either party on the overcharging aspect of the breach-of-contract claim.

**(3) Software's Delay in Performing Certain Services:**  Premier contends Software breached the agreement several times, by refusing to perform services that would allow new customers to submit images to be read by Premier's physicians.  The facts surrounding each incident are similar.  In one situation, an existing customer of Premier, Jacksonville Mobile Imaging, bought either an ultrasound machine or a digital x-ray machine (different witnesses provided differing accounts of the nature of the machine) and wanted to add it to Software's system in order to transmit images to be read by Software.  [Doc. 54, Exh. E; Doc. 59, Exh. 9, p. 162-65; Doc. 59, Exh. 13, 16]  Software refused to add the machine, allegedly because Premier was substantially behind on its payments to Software.[3]  [Doc. 59, Exh. 9, p. 165; Exh. 13, pp. 25-26]  Once Premier made a payment to Software, Software went ahead and provided the requested service.  [*Id.*]

A number of unresolved legal and factual issues are presented by the above scenario, precluding any grant of summary judgment.  First, the agreement between the parties does not appear to address Software's ability to refuse to provide requested services.  It would be absurd to construe the agreement to require Software to respond affirmatively to every request for service submitted by Premier or a customer of Premier; for example, Software might simply lack the resources to provide the requested services at the time they were requested.  On the other hand, while it seems incongruous to require Software to provide new services when it had not been paid for services it had already provided, the agreement is silent on that issue as well.  This

_____

[3]It is undisputed that Premier was chronically late in paying Software for its services, with Mr. Potter candidly admitting that one reason for this was the fact that Software charged no late fee, which allowed Premier to in essence obtain a low-interest loan.  [Doc. 56, Exh. D, pp. 35-36]

issue will need to be resolved with extrinsic evidence, including evidence concerning industry practices as well as the parties' understanding of their duties under the agreement. The Court also notes there is a dispute as to whether Premier was in fact harmed, and if so to what extent, by the delays in service. Summary judgment on this issue will therefore be denied.

**(4) Premier's Failure to Pay for Services Rendered:** As noted above, Premier regularly failed to pay in a timely manner for the services rendered by Software. In addition, around the time this  lawsuit was filed, Premier simply stopped paying anything to Software, and Mr. Potter stopped opening any of Software's e-mailed invoices. [Doc. 56, Exh. D, p. 114, 155] Software continued to provide services to Premier and its clients, apparently to avoid possible liability for further claims of breach of contract. Software now contends that Premier's failure to pay the amounts it owes is a breach of the parties' agreement. Premier, in response, makes two arguments: first, that some of the amounts charged by Software are disputed, as discussed in the preceding section; and second, that Premier is entitled to withhold payment from Software as a setoff against Software's potential liability for the claims Premier has brought in this lawsuit. As discussed below, neither of Premier's arguments has merit.

The agreement between the parties requires Premier to pay for the services provided by Software, except for any amounts that are disputed in good faith. As to those amounts, Software must explain in writing the amount disputed, as well as the reasons it believes the charged amounts are incorrect. [Doc. 1, Exh. 1, par. II] Instead of providing this written explanation to Software, Premier simply stopped looking at the invoices submitted by Software, and paid nothing toward the billed amounts. [Doc. 56, Exh. D, p. 114, 155] This does not comply with Premier's duties under the agreement, and does not legally justify the failure to pay Software for services Software undisputedly rendered. In addition, Premier's own executive, Mr. Potter, admitted in January 2009 that the disputed amounts consisted of at most a figure of around

11

$10,000; Software's accountant places the figure at around $12,100, if Premier were to be proved correct on all of its overcharging allegations.  [Doc. 59, Exh. 20; Doc. 56, Exh. C]  This is out of a total amount owed, as of last fall, of somewhere between $130,000 and 140,000, depending on interest charges.  [*Id.*]  Disputing ten percent or less of an amount charged does not constitute a good-faith dispute of the remaining ninety percent.  *See, e.g., BP Prods. N. America Inc. v. Int'l Maintenance Corp.*, 2005 WL 5976553 (S.D. Tex. 2005, unpublished) (contract does not allow BP to withhold payment for all charges based on a dispute involving a small percentage of those charges).

As to Premier's other argument, no authority was cited for the proposition that Premier was entitled to withhold payment as a set-off against Premier's possible recovery on its claims for breach of the solicitation agreement, tortious interference with contract, and other torts.  Most likely this failure was due to the fact that no authority supporting that position exists.  Where two opposing claims are legally independent and do not arise out of the same factual transaction, monies admittedly owed on one claim cannot be withheld as a set-off against potential recovery on the other claim.  *See, e.g., Schieffelin & Co. v. Valley Liquors, Inc.,* 823 F.2d 1064, 1065-67 (7th Cir. 1987) (defendant could not defend its nonpayment for goods admittedly received by arguing it had an offset for its potential recovery on a claim for loss of good will); *Gross v. Empire Healthchoice Assurance, Inc.*, 2006 WL  1358474 (N.Y. Sup. 2006, unpublished) (common-law rule is that mutual debts do not extinguish each other in the absence of agreement or judicial action); *State-William Partnership v. Gale*, 425 N.W.2d 756, 759 (Mich. App. 1988) (regardless of merits of party's fraud claim, those damages could not be set off against amount due on mortgage to preclude default); *Electro-Catheter Corp. v. Surgical Specialties Instrument Co., Inc.*, 587 F.Supp. 1446, 1455-56 (D. N.J. 1984) (plaintiff was entitled to summary judgment on claim for catheters delivered and not paid for, despite defendant's claim of off-set for amounts

owed by plaintiff to defendant); *see also* 15 Richard A. Lord, *Williston on Contracts*, § 44:34, p. 155 (4th ed. 2000) ("Where an absolute debt has arisen as the price or exchange for some performance received by the debtor, no breach of duty by the creditor will excuse the debtor from liability.").

In the case before the Court, Software has provided services to Premier and Premier has failed or refused to pay for those services. The disputed portion of the amount owed is small, and that is the only amount that may be legally offset against the total amount claimed by Software, because it is directly related to the question of how much money Premier actually owes to Software. As discussed above, Premier cannot rely on the fact that it may in the future recover damages on its unrelated claims for breach of the solicitation clause, breach of fiduciary duty, and tortious interference with contract, among others, as a legal defense to its failure to pay for services rendered. Therefore, summary judgment will be granted to Software on its breach-of-contract claim based on Premier's failure to pay undisputed amounts owed under the parties' agreement. The amount of damages to be awarded on this claim, however, must await a determination as to what amount, if any, of the disputed portion will be awarded to either Premier or Software.

**(5) Duty of Good Faith and Fair Dealing:** Both parties accuse the other of breaching the duty of good faith and fair dealing that is inherent in every contract. *See Watson Truck & Supply Co. v. Males*, 801 P.2d 639, 642 (N.M. 1990). These claims are closely tied to the parties' causes of action for breach of contract, and will of course not be allowed to duplicate any recovery that might be obtained from the contract claims. Furthermore, a question of intent, such as the "good faith and fair dealing" standard that must be applied to these claims, is rarely amenable to summary judgment. *See McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1129

(10th Cir.1998).  The Court will therefore deny both parties' motions for summary judgment as to the good-faith-and-fair-dealing claims.

**Tort Claims**

**(1) Breach of Fiduciary Duty:**  Premier contends Software owed a fiduciary duty to Premier, because Premier entrusted confidential client information to Software.  This confidential information allegedly consisted of the names and business needs of Premier's clients;  according to Premier, Software was contractually obligated to keep this information secret and not use it for its own purposes.  The entrustment of this confidential information to Software, argues Premier, created a broad fiduciary duty that required Software to place Premier's interests ahead of its own.  Software allegedly violated this duty by entering into business with Schryver (through TeleRad) at Premier's expense.  Software, for its part, contends no fiduciary duty can arise, as a matter of law, in an arm's length business transaction such as the business relationship between Software and Premier.  Software does not discuss the entrustment-of-confidential-information argument raised by Premier.

Again, although each side's arguments possess some level of validity, neither position is an entirely accurate reflection of the law.  As Software argues, generally in an arm's-length business transaction no fiduciary duties are created with respect to any of the parties to the transaction.  *See Azar v. Prudential Ins. Co. of America*, 68 P.3d 909, 926 (N.M. App. 2003).  However, it is not true that a fiduciary duty can never arise out of a business transaction such as the one that occurred in this case.  *See, e.g., Moody v. Stribling*, 985 P.2d 1210, 1216 (N.M. App. 1999) (fiduciary relationship can exist in almost any context).  In particular, some authorities hold that a fiduciary duty may arise where the parties to a transaction have agreed that confidential information will be exchanged, and will be kept secret, as part of the business relationship between  the parties, although other courts disagree.  *See, e.g., Triton Constr. Co.,*

14

*Inc. v. Eastern Shore Elec. Servs., Inc.*, 2009 WL 1387115 (Del. Ch. 2009, unpublished); *Maffei v. Roman Catholic Archbishop of Boston*, 867 N.E.2d 300, 313 (Mass. 2007); *Ha-Lo Indus., Inc. v. Credit Suisse First Boston Corp.*, 2005 WL 2592495 (N.D. Ill. 2005, unpublished); *but see RPM, Inc. v. Oatey Co.*, 2005 WL 663057 (Ohio App. 2005, unpublished) (agreement to keep information confidential does not create fiduciary duty, but contractual one); *City Solutions, Inc. v. Clear Channel Commc'ns, Inc.*, 201 F.Supp.2d 1048, 1049 (N.D. Cal. 2002) (parties to a confidentiality agreement do not stand in fiduciary relationship simply by virtue of the agreement). For purposes of this opinion, given New Mexico's expansive interpretation of fiduciary relationships, the Court will assume that it is possible to create a fiduciary duty if there is an agreement to exchange confidential information. The Court will remain open to persuasion to the contrary, however.

Even though a fiduciary duty may be created when confidential information is entrusted to another party, that duty is not nearly as broad as Premier describes it. According to Premier, the entrustment of such information imposes a general fiduciary duty upon the recipient to place the entrustor's interests above its own, and to refrain from acting in any manner that might benefit its own interests at the expense of the entrustor's interests. In actuality, any fiduciary relationship that is created by the entrustment of confidential information is limited to the purposes for which the relationship was created -- the protection of the confidential information. This means the fiduciary duty is limited to the information that was entrusted -- the recipient has a duty not to disclose that information or to use it for its own benefit at the expense of the entrustor. *See, e.g., Financial Tech. Intern., Inc. v. Smith*, 247 F.Supp.2d 397, 411 (S.D. N.Y. 2002) (employees have a fiduciary duty not to use or disclose confidential information gained as a result of their employment); *City Solutions, supra,* 201 F.Supp.2d at 1050 n. 1 (even if confidentiality agreement created fiduciary duties, presumably those duties would encompass

15

only the non-disclosure of confidential information); *Triton, supra* (employee to whom confidential information is disclosed has fiduciary duty to safeguard the information and not disclose it to a competitor).

The above discussion leads to the conclusion that summary judgment cannot be granted on the breach-of-fiduciary-duty claim.  As noted above, the Court anticipates the New Mexico courts would reject Software's position that an arm's-length business transaction cannot create fiduciary duties.  On the other hand, a number of issues require factual development before Premier has established the elements of a breach of fiduciary duty.  First, it is insufficient for Premier to simply argue that it reposed confidence and trust in Software, and that fiduciary duties arose as a result.  The parties to every contract repose trust and confidence in each other, and yet fiduciary duties do not arise out of every contract.  *See City Solutions, supra*, 201 F.Supp.2d at 1049 (fiduciary obligations are not imposed simply because the parties to a contract reposed trust and confidence in each other); *City of Hope Nat'l Med. Center v. Genentech, Inc.*, 181 P.3d 142, 153-54 (Cal. 2008) (because every contract to some extent requires a party to repose trust and confidence in each other, fiduciary obligations are not created when one party entrusts valuable intellectual property to another).  Premier must point to specific contractual provisions or other agreements that might create fiduciary duties, and show that these provisions evidenced Software's agreement to assume such duties.  *See, e.g., S.E.C. v. Lyon*, 605 F.Supp.2d 531, 544 (S.D. N.Y. 2009) (fiduciary duty cannot be imposed unilaterally simply by entrusting a party with confidential information).

Premier relies on the "client content" provisions of the agreement to create the requisite fiduciary duty.  However, a review of those provisions gives no indication that the names of Premier's clients, such as Schryver, were considered confidential information subject to special protection.  The "client content" referred to in the agreement consists of information Premier

16

placed on the web site that was hosted by Software.  [Doc. 1, Exh. 1, par. C]  There is no specific indication this information was intended to include Premier's customer list.  In addition, even if this was Premier's intention, often a business entity's customer list does not constitute confidential information at all.  *See  Bijan Designer for Men, Inc. v. Katzman*, 1997 WL 65717 (S.D. N.Y. 1997, unpublished) (customer list should be considered confidential trade secret only if it was developed through substantial effort and kept in confidence, and the information contained in it is not readily ascertainable through public sources).  New Mexico follows this rule.  *See Rapid Temps, Inc. v. Lamon*, 192 P.3d 799, 804 (N.M. App. 2008) (client database that was developed over many years and at considerable expense constituted trade secret deserving legal protection); *see also Frantz v. Johnson*, 999 P.2d 351, 358-59 Nev. 2000) (setting out factors to be considered in determining whether information, such as customer and price list, should be protected as trade secret).  Premier has not submitted any information concerning the nature of its customer list and how it was considered confidential information.

Finally, Software has failed to establish a right to summary judgment on the issue of causation.  Even if Schryver's identity should be considered confidential information, and even if Software had a fiduciary duty not to use that identity to Premier's detriment, the evidence presented does not show that Software used its access to Schryver's identity, or other confidential information concerning Schryver, in its successful attempt to enter into a business relationship with Schryver.  The only evidence before the Court indicates Schryver approached Software first, not that Software consulted Premier's client list and used that as a basis to pursue Schryver.  There has also been no evidence that Software gained particular knowledge about Schryver's business needs from Premier, and used that information in its negotiations with Schryver.  In sum, no evidence has yet been presented that would support a causal connection between Premier's entrustment of information to Software, and Software's successful pursuit of  Schryver

17

as a customer.  This is another basis on which Premier's request for summary judgment will be denied.

(2) **Tortious Interference With Contract:**  Premier contends Software tortiously interfered with Premier's contracts with Schryver as well as two other customers of Premier – Jacksonville Mobile Imaging and Regency Hospitals.  The basis of the claim concerning Schryver, of course, is Premier's allegation that Software, through TeleRad, lured Schryver away from Premier as a customer.  The other two claims arise out of Software's allegedly wrongful delay in providing certain services to these customers, due to Software's refusal to provide additional services until Premier had paid certain monies it owed.  The Court will first discuss the Schryver situation.

In New Mexico, the elements of a claim of intentional interference with a contract are as follows:  (1) the defendant had knowledge of a contract between the plaintiff and a third party; (2) the contract was not fulfilled, or the plaintiff was unable to fulfill its contractual obligations; (3) the defendant played an active and substantial part in causing the plaintiff to lose the benefits of the contract; (4) the plaintiff suffered damages resulting from the breach; and (5) the defendant induced the breach without justification or privilege to do so.  *See Martin v. Franklin Capital Corp.*, 195 P.3d 24, 27 (N.M. App. 2008).  The "justification or privilege" element has been distilled into the following requirement:  the plaintiff must prove that the defendant acted with either an improper motive or by improper means.  *Id.*  With respect to that requirement, existing contracts that are not terminable at will are given greater protection than either prospective contracts or at-will contracts, which are treated in the same manner as prospective contracts.  *See Fikes v. Furst*, 81 P.3d 545, 552 (N.M. 2003) (at-will contracts are equivalent to prospective contracts); *Zarr v. Washington Tru Solutions, LLC*, 208 P.3d 919, 922-23 (N.M. App. 2009) (New Mexico cases have consistently recognized that existing contractual relations merit more

18

protection than prospective contracts; at-will employment relationship is treated as prospective

employment relationship for purposes of claim of intentional interference with employment

contract).

     The main difference between existing contracts and at-will contracts is that to prove

intentional interference with an at-will contract, the plaintiff must prove that the defendant's sole

motive for its actions was to harm the plaintiff.  *Zarr*, 208 P.3d at 923.  If the defendant had a

legitimate business reason for its actions, the plaintiff cannot prevail on the motive question,

even if the defendant also intended to harm the plaintiff.  *Id.* at 924.  Legitimate business reasons

include the desire to make a sale and earn a profit.  *See Martin, supra*, 195 P.3d at 29 ("The

desire to earn a profit is not an improper motive.").

     Whether the contract between Premier and Schryver qualifies as an existing contract or an

at-will contract is therefore significant.  The undisputed evidence submitted in this case indicates

the contract was indeed terminable at will.  The contract stated as follows:  "<u>With or Without

Cause</u>.  Either party may terminate this Agreement at any time, with or without cause, by giving

sixty (60) days prior written notice to the other party."  [Doc. 54, Exh. C, Exh. A par. IX.B.5]

Mark Schryver submitted an affidavit stating his opinion that the contract allowed Schryver to

terminate with sixty days' notice, and no contrary interpretation of that opinion has been offered

by Premier.  [*Id.* Exh. C]  The only restriction on either party's ability to terminate the contract,

therefore, was the requirement of  sixty days' advance notice.  Such an advance-notice

requirement does not alter a contract's status as an at-will contract.  *Int'l Klafter Co., Inc. v.*

*Continental Cas. Co.*, *Inc.*, 869 F.2d 96, (2d Cir. 1989) (contract terminable by either party with

thirty days' notice was at-will contract); *Cave Hill Corp. v. Hiers*, 570 S.E.2d 790, 793 (Va.

2002) (same, for employment contract, despite ostensible term of employment of five years);

*Alderman Drugs, Inc. v. Metropolitan Life Ins. Co.*, 515 N.E.2d 689, 694  (Ill. App. 1987)

(contract was terminable at will where insured could terminate with thirty days' notice); *Shaull Equip. & Supply Co. v. Rand*, 2004 WL 3406088 (M.D. Pa. 2004) (contract could be terminated with or without cause, on sixty days' written notice; contract was terminable at will).  Since the contract was terminable at will, and Software had a legitimate business reason (earning more money) for attempting to obtain Schryver's business, Premier cannot satisfy the improper-motive requirement of the intentional-interference-with-contract tort.

The remaining question is whether there is any evidence Software used improper means in its dealings with Schryver.  The improper-means factor is quite limited in scope; actions that might qualify as improper means include bribery, violence, threats or intimidation, deceit or misrepresentation, unfounded litigation, defamation, or other unlawful conduct.  *See Zarr, supra*, 208 P.3d at 922.  No evidence submitted in this case rises to such a level; at most it establishes that Software breached its non-solicitation agreement with Premier and by doing so stole a customer from Premier.  Such a breach of contract does not constitute improper means, especially given New Mexico's reluctance to expand the tort of intentional interference.  *See, e.g., Guest v. Berardinelli*, 195 P.3d 353, 363 (N.M. App. 2008) (noting that establishing tortious interference with contract is not easy).  Summary judgment is therefore appropriate on this claim insofar as it concerns the Schryver/Premier contract.  *See Zarr, supra*, 208 P.3d at 924-25 (if accused can show a legitimate business reason for the action, even if there was also a motive to harm the plaintiff, no material fact dispute exists as to a claim for intentional interference with an at-will contract).

The Court has been provided no information concerning the nature of the contracts between Schryver and its two other customers, Jacksonville Mobile and Regency Hospitals.  For summary-judgment purposes, then, viewing the facts in the light most favorable to Premier, the Court must assume the contracts were not at-will agreements.  Where an existing contract is at

20

issue, a plaintiff need not show that the defendant's sole motive for interfering with the contract was to harm the plaintiff. *See Fikes v. Furst*, 81 P.3d 545, 552 (N.M. 2003). However, even if the plaintiff can show some intent on the part of the defendant to inflict harm on the plaintiff, the plaintiff must still establish that the defendant's primary motive was not to protect the defendant's own interests. *Id.* In other words, even where an existing contract is at issue, it is difficult for a plaintiff to prevail on an interference-with-contract claim. The parties agree that the reason for Software's actions with respect to both Regency and Jacksonville was the same – Premier owed Software money for services previously provided by Software, and Software refused to perform additional services until that money had been paid. [Doc. 59, Exh. 2, pp. 112-16; Exh. 9, pp. 162-63, 169] This type of action – making one party's payment of money owed under a contract a prerequisite of providing further services under the contract – is obviously a legitimate business reason.[4] No evidence has been presented that would allow an inference that Software acted out of a desire to harm Premier. Furthermore, there is no evidence that Software utilized improper means with respect to either Regency or Jacksonville. Therefore, summary judgment will be granted on the tortious-interference-with-contract claim with respect to these contracts.[5]

   **(3) Conversion:** Premier contends that Software converted its confidential information and used that information for its own benefit to obtain Schryver as a customer. This claim is quite similar to the breach-of-fiduciary-duty claim. As such, it suffers from the same factual and

---

[4]This is true even if, as noted above, Software's actions might possibly be construed as a breach of contract. If Software did not have the contractual right to engage in such self-help collection activity, and a breach of contract has occurred, the fact remains that collecting money owed is a legitimate business reason for taking action.

[5]The Court notes that evidence concerning the breach-of-contract claims may be relevant to the tortious-interference claims. The Court will entertain a motion to reopen these tort claims if the evidence presented at trial concerning the alleged breaches of contract turns out to support the tort claims as well.

legal deficiencies:  it is not clear Schryver's identity was confidential information meriting legal protection, and the facts surrounding Software's dealings with Schryver are not clear enough to merit summary judgment in favor of Premier.  Furthermore, the only authority cited by Premier in support of this claim is a general conversion-of-property case that is not specific to the context of confidential information.  *See Nosker v. Trinity Land Co.*, 757 P.2d 803 (N.M. App. 1988). Given the similarities between this claim and the fiduciary-duty claim, the Court will allow it to proceed to trial.  However, at trial the Court will expect a much more focused legal presentation, outlining the elements of a claim for conversion or misappropriation of confidential information. In addition, the Court is aware of authority for the proposition that common-law claims for misuse of trade secrets are pre-empted by state statutes such as the Uniform Trade Secrets Act ("UTSA").  *See, e.g., Youtie v. Macy's Retail Holding, Inc.*, 653 F.Supp.2d 612, 619-20 (E.D. Pa. 2009).  The parties should be prepared to address the issue of whether this common-law claim, should it be factually supported, is pre-empted by New Mexico's version of the UTSA.

### Damages

Since the Court is denying summary judgment as to most claims and counter-claims, it is not necessary at this time to address the damages issue.  The Court does point out, however, that as Software argues in its supplemental brief on this issue, establishing a reduction in gross revenues alone will not suffice to establish damages for either the breach-of-contract claims or the tort claims.  Instead, evidence will need to be presented concerning lost profits, not simply lost revenues.  *See, e.g., Chavez Properties-Airport Parking Albuquerque, LP v. Lorentzen*, 204 Fed.Appx. 745, 757 (10th Cir. 2006, unpublished) ("In calculating lost profits, evidence of gross profits alone has no evidentiary value and failure to present evidence of expenses is detrimental to the claim"); *Strata Production Co. v. Mercury Exploration Co.*, 916 P.2d 822, 832-33 (N.M. 1996) (measure of damages for breach of contract is lost profits).

**Conclusion**

Based on the foregoing, summary judgment will be denied on all of Plaintiff's claims except the claims for tortious interference with contract; as to those claims, summary judgment will be granted to Software.  Summary judgment will be granted as to liability only on Software's counterclaim for moneys owed.

**ORDER**

In accordance with the above Memorandum Opinion, it is hereby ORDERED that Plaintiff's motion for summary judgment (Doc. 59) be, and hereby is, DENIED; it is also ORDERED that Defendants' motion for summary judgment (Doc. 55) be, and hereby is, GRANTED in part and DENIED in part; and it is also ORDERED that Defendants' motion for summary judgment (Doc. 53) be, and hereby is, GRANTED in part and DENIED in part.

Dated this 25th day of October, 2010.


BRUCE D. BLACK
United States District Judge

23